**IN THE**
**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**ROCK ISLAND DIVISION**

LINDA W.,
      Plaintiff,

v.                                              Case No. 4:19-cv-04066-SLD-JEH

COMMISSIONER OF SOCIAL
SECURITY,
      Defendant.

**Report and Recommendation**

Now before the Court is the Plaintiff's Motion for Summary Judgment (Doc. 13) and the Defendant's Motion for Summary Affirmance (Doc. 17). This matter has been referred for a report and recommendation. The Motions are fully briefed, and for the reasons stated herein, the Court recommends the Plaintiff's Motion for Summary Judgment be denied and the Defendant's Motion for Summary Affirmance be granted.[1]

**I**

Linda W. filed a Title II application for disability insurance benefits (DIB) as well as a Title XVI application for supplemental security income (SSI) on February 25, 2013. She alleged disability beginning on October 27, 2012. Her claims were denied initially in July 2013 and upon reconsideration in January 2014. After a hearing before an Administrative Law Judge in August 2015, an unfavorable decision was issued in November 2015. Linda's request for review of that decision by the Appeals Council was denied in February 2017, and Linda thereafter sought

---

[1] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears at (Doc. 7, 8) on the docket.

review in this Court.  This Court remanded the case to the ALJ for further proceedings in January 2018.

At a second hearing before the Honorable Vicky Ruth (ALJ) on September 19, 2018, Linda was represented by counsel, and Linda, a Vocational Expert (VE), and a medical expert testified.  Following that hearing, Linda's claims were again denied on December 6, 2018.  Linda filed the instant civil action seeking review of the ALJ's December 2018 Decision on March 26, 2019.

## II

At the September 2018 hearing, Linda testified that since the last hearing, she left her husband and was living with her daughter.  When she originally applied for DIB and SSI in 2013, Linda claimed the following conditions limited her ability to work:  non-alcoholic liver disease; congestive heart failure; diabetes; hypertension; severe depression; chronic fatigue; anxiety; pain; high blood pressure; and muscle pain.  AR 239.  After her alleged onset date, Linda was diagnosed with Parkinson's disease.

The ALJ first elicited testimony from Medical Expert (ME) Clinical Psychologist Joseph Michael Carver, Ph.D.  Dr. Carver testified that he reviewed the medical information in the record down to the very last exhibit in Linda's record.  He testified Linda's medical records contained mental health issues in two primary areas; the first was under Mental Disorders Listing 12.04 (Depressive, bipolar and related disorders) given her diagnosis of major depressive disorder, moderate, and the second was under Listing 12.06 (Anxiety and obsessive-compulsive disorders) given her diagnosis of the beginning of panic attacks and a diagnosis of generalized anxiety disorder.  Dr. Carver discussed the medications Linda was prescribed and that it appeared she discontinued medications on her own in December 2017.  He stated Linda was not impaired in her ability to understand, remember, and apply information; she was mildly impaired in her

ability to interact with others; she was moderately impaired in her ability to maintain concentration, persistence, or pace; and she was not impaired in her ability to adapt and manage herself. Dr. Carver noted that he could see "no real professional mental health care" Linda obtained. AR 768.

Linda testified that since the last hearing, she continued to feel dizzy once a day for 15 to 20 minutes. Her shoulders hurt which a doctor told her was caused by her Parkinson's disease. Her right arm had not stopped moving since the hearing started. Her left arm did not "dance" as much as her right arm. AR 787. She had problems writing and lifting things. While her chest pains were better, she still had them "maybe" once a month. AR 788. She was down to just one two-hour nap a day from two naps a day. She said she laid back in her recliner six hours per day. She complained of numbness and tingling in her extremities which was caused by her diabetes, and she took medication for swelling in her hands. She experienced suicidal thoughts and cried daily.

Linda also testified that she needed help to get dressed "[a]t times." AR 797. She could write legibly "at times" but for less than a minute at a time. AR 800. Since the last hearing, Linda said she could no longer walk as far which she attributed to a worsening of her Parkinson's disease. She drove herself about 15 minutes to the post office a couple days before the hearing. As with the previous hearing, Linda was driven the two hours to the hearing because she could not drive that far on her own.

The VE then testified that a hypothetical individual who could do light exertional level work, who could perform simple, routine tasks and make simple work-related decisions, and who could have occasional interaction with the public and coworkers would not be able to do Linda's past work but could perform other work in the national economy. The VE also testified that same individual further limited to no fast-pace production work would still be able to perform other work

in the national economy.  The ALJ further limited the hypothetical individual to sedentary work with the option to shift or alternate positions every 60 minutes while remaining at the workstation on task.  The VE testified that other work in the national economy existed.  Other jobs existed in significant numbers even if the hypothetical individual was further restricted to avoid concentrated exposure to pulmonary irritants and all exposure to workplace hazards.  Absenteeism from work two days per month on an unscheduled basis, one to two extra breaks of 15 minutes each during the workday, and off task behavior for 15% of the workday would eliminate all occupations at all levels.  Linda's attorney then elicited testimony from the VE that if the hypothetical individual were limited to only occasional reaching/handling/fingering/feeling on the dominant arm, both the identified sedentary and light jobs would be eliminated.

### III

The ALJ determined Linda had the following severe impairments at Step Two:  major depressive disorder; diabetes mellitus and related neuropathy; fatty liver disease or kidney disease; hypertension; obesity; mild Parkinson's disease; and degenerative disc disease.  AR 741.  At Step Three, the ALJ noted inconsistencies between Linda's hearing testimony and record evidence (the reason she stopped a medication, the frequency of depressive symptoms).  The ALJ also noted that at the hearing, Linda attributed her confusion to physical ailments rather than her mental condition.  The ALJ made the following residual functional capacity (RFC) finding:

> [T]he claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she is limited to work involving simple, routine tasks and simple work-related decisions. She can have up to occasional interaction with the public and coworkers.

AR 743.

The ALJ explained that she "assessed the treatment evidence chronologically to ascertain whether there is a discernable range of functioning that the claimant possessed throughout the period at issue." AR 744. With regard to Linda's mental health, the ALJ first cited a February 2013 record wherein the physician's assistant observed Linda to have flat psychiatric affect, demeanor, and speech pattern and a disheveled appearance. The physician's assistant also observed at that time that Linda had normal cognition and normal psychomotor function. The ALJ lastly cited to an August 2017 medical note in which the doctor observed Linda to be alert and oriented with normal recent and remote memory, normal attention and concentration, a grossly normal fund of knowledge, normal verbal fluency, normal comprehension, and grossly normal basic naming. Between February 2013 and August 2017, Linda was observed in April 2013 to have signs of a depressed mood and hopeless thought content while cognitively and neurologically intact, she was observed in December 2013 with signs of ongoing anxiety and psychomotor retardation though within a few weeks she presented with no feelings of depression or suicidal thoughts and a normal ability to control her thoughts, she acknowledged feelings of anxiety but was able to control thoughts and denied feelings of depression in November 2014, and she retained full orientation and normal concentration in September 2015. During the course of the ALJ's review of the "psychiatric evidence," the ALJ stated, "[T]he overall effect of the evidence does not indicate higher erosions than would eliminate capacity for simple routine tasks." AR 745. The ALJ later observed, "Providers continued to document both examination signs of physicality and psychiatry, which here provides a helpful continuity of the claimant's range of function." *Id*.

The ALJ discussed medical records which provided that Linda presented with normal musculoskeletal signs and normal cardiovascular testing, she

received a tentative Parkinson's disease diagnosis in August 2015, and she had imaging done in April 2017 which showed spinal canal stenosis secondary to degenerative disc disease with spondylosis and multilevel spondylosis and degenerative disc disease in the thoracic and lumbar spine.

As for Linda's right arm tremor and bodily pains she highlighted during the September 2018 hearing and her normal neurological findings in January 2014, the ALJ commented: "While it is possible that these symptoms had not developed yet, the undersigned must account for this in the [RFC] if later findings do not show an appreciable difference in range of functioning." AR 746. The ALJ observed that "Providers continued to monitor the claimant's onset of Parkinson's but did note [sic] any signs of remarkably changing functionality." AR 747. Where a doctor in December 2016 noted no atrophy of the right or left hands and grossly intact motor function bilaterally, the ALJ pointed out that, "Notwithstanding the claimant's manifestation of Parkinson's symptoms, there is no evidence to suggest any additional limitations other than what is set forth above." *Id.* The fact that an August 2017 medical record indicated Linda's motor strength "to be full at a five out of five even while noting her tremor intermittently during walking" led the ALJ to conclude, "This shows ongoing capacities within the [RFC]." AR 748. The ALJ further highlighted that reports through April 2018 noted, among other things, Linda's ability to get up and ambulate on her own despite an antalgic gain due to pain in her knees and hips.

The ALJ gave "partial weight" to consultative psychiatric clinician Frank Froman, Ed.D.'s May 2013 opinion. AR 745. She gave "partial weight" to ME Dr. Carver's September 2018 hearing opinion. AR 748. Lastly, the ALJ gave "little weight" to the State Agency reviewing doctors' opinions because their opinions were "well outdated" as "they likely did not assess as developed a record as is the

basis for [the ALJ's] findings," and they did not have the benefit of examining the claimant.  AR 749.

## IV

Linda argues:  1) the ALJ committed reversible error when she failed to give appropriate weight to the consultative examining psychologist Dr. Frank Froman's opinion in light of 20 C.F.R. § 404.1527(d) and § 416.927(d); and 2) the ALJ committed reversible error when she did not determine an RFC based on substantial evidence.

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence.  *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied.  *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision.  *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for

disability. *See* 20 C.F.R. § 404.1566; 20 C.F.R. § 416.966[2]. The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). The factual determination is made by using a five-step test. *See* 20 C.F.R. § 404.1520. In the following order, the ALJ must evaluate whether the claimant:

1)    currently performs or, during the relevant time period, did perform any substantial gainful activity;

2)    suffers from an impairment that is severe and meets a durational requirement, or suffers from a combination of impairments that is severe and meets the durational requirement;

3)    suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

4)    is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and

5)    is unable to perform any other work existing in significant numbers in the national economy.

*Id*. An affirmative answer at steps 3 or 5 leads to a finding that the plaintiff is disabled. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

---

[2] The standards for establishing a disability in order to receive DIB and SSI are materially the same. *Compare* 20 C.F.R. § 404.1501 *et seq*. (DIB) *with* 20 C.F.R. § 416.901 *et seq*. (SSI). Thus, the Court may at times only cite to the DIB regulations.

The plaintiff has the burdens of production and persuasion on steps 1 through 4. *Id*. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

In the instant case, Linda claims error on the ALJ's part at step at Step Four.

## A

The crux of Linda's first argument is that the ALJ failed to give controlling weight to clinical psychologist Dr. Froman's opinion because the ALJ incorrectly discounted as vocational in nature his opined-to limitations. The Commissioner argues that the ALJ reasonably concluded Dr. Froman's opinion regarding Linda's physical ability for vocational activities was outside his area of expertise – clinical psychology. The Commissioner further argues that substantial evidence supported the ALJ's evaluation of Dr. Froman's opinion.

Dr. Froman examined Linda on May 14, 2013, and completed a Psychological Report in which he concluded:

> It seems unlikely that Linda would be able to perform one or two step assemblies at or even near a competitive rate anymore. She is still able to relate modestly but somewhat colorlessly to others. She can understand oral and written instructions, but appears to lack the physical capacity to be able to perform them.
> She is able to manage benefits in her own behalf. It is unlikely that she would be able to withstand the stress associated with customary employment.

AR 439. The ALJ determined Dr. Froman's opinion was partially consistent with the effect of clinically observed signs during treatment, but "Froman's comments on matters outside his expertise – such as vocational abilities for assembly and physical capacity – are given are not persuasive nor consistent with the overall

evidence." AR 745. Thus, the ALJ gave "partial weight to the elements that are consistent with the mental status signs" including the ability to manage benefits and understand instructions, but ultimately found that Dr. Froman's opinion "does not support higher erosions than the above RFC." *Id*. 20 C.F.R. § 404.1527(c) provides:

> How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

The listed factors include, among other things: the examining relationship; supportability; consistency; and the source's specialization. *Id*.

Even assuming Dr. Froman's conclusion as to one and two-step assemblies related not to Linda's physical ability but instead to her ability to maintain concentration, persistence, or pace (as Linda argues), it was harmless error for the ALJ to afford Dr. Froman's opinion less than controlling weight partially for the reason he commented on matters outside his expertise. *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) (explaining that administrative error may be harmless and thus a court ought not remand a case to the ALJ where it is convinced that the ALJ would reach the same result). The ALJ's analysis of the record evidence pertaining to Linda's concentration, persistence, or pace limitations was sufficiently articulated and supported elsewhere in the Decision.

At Step Two, the ALJ cited evidence which revealed Linda had normal attention and concentration toward the end of the period at issue, she presented with normal cognitive features including intact memory and control of thoughts during most of her encounters, and she showed a continuity of seeking examination and treatment with her providers during the period at issue. The ALJ determined Linda's main cause of limitation was depression, "which can reduce

10

motivation for persistence and pace."  AR 742.  Later, the ALJ pointed to Linda's activities, as reported by her husband, to include reading and knitting which "indicates mental capacities within the [determined RFC]."  AR 744.  The ALJ also pointed out that Linda was determined to have normal cognition, normal psychomotor function, normal memory, normal insight, intact judgment, and normal attention.  The ALJ observed that such normal findings were made even when Linda presented with signs of depression, guarded attitude, anxiety, flat speech, and psychomotor retardation.  Where Linda's daughter stated in a third party functionality report that Linda was forgetful and needed reminders for normal tasks and activities, the ALJ found it:

> conceivable that given the instance of psychomotor retardation cited [earlier in the Decision] the claimant may manifest forgetfulness, but the other evidence of intact memory and neurology prevents finding that the degree of forgetfulness is so high that it would disqualify the claimant from simple, routine tasks.

AR 746.

The foregoing permits the Court to trace the path of the ALJ's reasoning from evidence of Linda's continuing mental impairments to her conclusion that the limitations from those mental impairments did not so interfere with her concentration, persistence, or pace that she would remain unable to perform simple, routine tasks; thus, contrary to Linda's suggestion, her concentration, persistence, or pace limitations did not preclude her from one to two-step assemblies.  *See Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (stating that an ALJ must "sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence . . . and to enable us to trace the path of the ALJ's reasoning").  Furthermore, the ALJ's stated reasons for finding Linda's moderate limitations in concentration, persistence, or pace limited her to simple, routine, and work-related decisions illustrate the consistency the ALJ found

between the record evidence as a whole and Dr. Froman's conclusions regarding Linda's "mental status signs."

**B**

Linda next takes issue with the ALJ's RFC assessment, arguing that if the ALJ had adequately determined an RFC based on her substantial complaints and combined impairments, the ALJ would have determined Linda would not be able to attend work on a continuing basis and perform the demands required of a light occupation. The Commissioner's opposition is premised upon three arguments: the ALJ properly evaluated Linda's subjective symptoms; the ALJ did not err in considering Linda's GAF scores; and the ALJ's mental RFC finding was supported by substantial evidence.

Linda takes issue with the ALJ's consideration of her symptoms of anxiety and depression, her right hand tremor and leg stiffness, her back pain, and her chest pain. An RFC assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p; *see also Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001) ("In assessing the claimant's RFC, the ALJ must consider both the medical and nonmedical evidence in the record"). The RFC assessment necessarily includes consideration of a claimant's subjective statements as to symptoms. SSR 16-3p provides that all the evidence, including objective medical evidence, is to be considered in evaluating the intensity, persistence, and limiting effects of an individual's symptoms and also the factors set forth in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) are to be considered including: the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; medications and their side effects; non-medication treatments; any other measures used to relieve pain or other

12

symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain and other symptoms. SSR 16-3p, at *7-8.

Here, the ALJ recapped Linda's September 2018 hearing testimony which included her complaints of right sided disruptive arm tremors, daily and disruptive naps, crying episodes, lack of interest, swelling in her hands that interfered with daily activities, and her need for help at times to get dressed. The ALJ found that "the evidence in terms of present sense clinical signs and mental status shows little variation in the claimant's range of physical functioning from October of 2012 to the present." AR 744.

With regard to Linda's me
ntal health symptoms, the ALJ discussed the record evidence which revealed that even when Linda was observed to be depressed, she retained, among other things, normal memory and normal cognition. The ALJ explained why Dr. Froman's opinion was given only partial weight to parts of his conclusions (see *supra*). The ALJ discussed ME Dr. Carver's testimony that Linda had major depressive disorder featuring some symptomology listed in Listing 12.04, and the ALJ explained Dr. Carver's opinion that she could still carry out simple, detailed, and complex information and tasks and could interact with others normally deserved "partial weight". The ALJ noted the range of Linda's lower GAF scores and acknowledged GAF scores were "technically opinions regarding functionality," but nevertheless faulted such a source as highly subjective and offered only a "snapshot" of a claimant's functioning on a given day. AR 748-79. The ALJ noted the treatment prescribed for Linda's mental health issues was "quite conservative, such as coping skills and changing thought process." AR 745. The ALJ gave "partial weight" to an intake clinician's opinions that Linda was able to self-administer her medications and participate in treatment within normal limits insofar as those opinions were consistent with intake notes. As mentioned

previously, the ALJ considered that in his third-party report Linda's husband "admit[ted] to the claimant's tendency for reading and ongoing hobby of knitting." AR 744. The foregoing reveals the ALJ considered the medical and non-medical evidence alike as well as factors including Linda's daily activities, the duration and frequency of her mental health symptoms, and the prescribed treatment for her mental health symptoms all in accordance with SSR 96-8p and SSR 16-3p. In doing so, the ALJ sufficiently connected the dots between the evidence and her determination that Linda's mental health symptoms were not as intense or as limiting as she alleged. *Compare Young v. Barnhart*, 362 F.3d 995, 1002-03 (7th Cir. 2004) (finding the ALJ failed to permit the court from affording the claimant meaningful judicial review where the ALJ did not sufficiently connect the dots between the claimant's impairments, supported by substantial evidence in the record, and the RFC finding).

With regard to Linda's physical symptoms, the ALJ considered her husband's third-party report in which he stated Linda kept a sedentary lifestyle in her home and her daughter's third-party report in which she stated Linda frequently complained of back and chest pain which necessitated help with her daily chores and Linda was observed to be unsteady on her feet. The ALJ considered the medical records which indicated normal musculoskeletal signs of gait, normal muscle strength, normal tone, normal sensations full range of motion, and no tenderness on palpation in the back or spine. She considered that cardiovascular testing in June 2014 resulted in "normal" conclusions. The ALJ also pointed to record evidence that Linda failed to take her insulin for over one month to treat her diabetes which correlated with a spike in blood sugar and weight gain.

As for Linda's Parkinson's disease, the doctor who made its tentative diagnosis in August 2015 wrote that Linda's current level of functioning included abilities to ambulate unassisted, bathe, control her bladder, control her bowel

function, dress herself, feed herself, converse in a meaningful manner, remember her name, remember where she lived, and remember the date. Following a neurological examination in September 2015, Linda's Parkinson's was characterized as mild. The ALJ found notable that Linda reported to a doctor in September 2015 that she had the tremor in her hands for almost two years which, the ALJ reasoned, "indicates that the claimant may still have been functioning consistent with the earlier examination findings, notwithstanding her complained of tremors." AR 747. The ALJ noted that Linda continued to show normal musculoskeletal presentations into and through 2016.[3] In December 2016, Linda's comprehensive neurological examination showed grossly intact motor function of the hands bilaterally and no atrophy of the hands. In August 2017 a doctor noted Linda was able to read and write, and her motor strength was 5/5. The ALJ pointed out doctors' later reports in October 2017 and April 2018, among others, continued to show similar observations.

It is clear such evidence caused the ALJ to find Linda exaggerated the extent of her physical limitation and, in turn, caused the ALJ to determine Linda retained the physical ability to perform the demands of light work. Moreover, the ALJ's extensive discussion of the results of musculoskeletal examinations does away with Linda's argument that it is unclear how her back pain, supported by a CT scan, equated to her being able to perform light work. The ALJ narrated:

> Despite the ongoing musculoskeletal findings of normality through the period at issue, there is objective radiological imaging to corroborate the claimant's allegations of back pain toward the end of the period at issue . . . These revelations [imaging results] require consideration in the [RFC] as a matter of course.

---

[3] Linda points out that the ALJ mistakenly identified a May 2015 record as dated March 28, 2016 in support of that statement. The record dated May 2015 provided that Linda had a normal gait, normal tone, and normal muscle strength. *See* AR 1062 (Exhibit 23F/4). While true, the ALJ's error was harmless in that regard as she subsequently cited an August 2017 record which also provided Linda had a normal gait, 5/5 strength in all four limbs, and no atrophy. *See* AR 1119-20 (Exhibit 24F/32).

AR 748. A reasonable mind could accept as adequate to support a RFC of light work the combined evidence of objectively seen degenerative disc disease and normal musculoskeletal examinations. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("And whatever the meaning of 'substantial' in other contexts, the threshold [in the administrative law context] for such evidentiary sufficiency is not high").

For all the evidence she cites and discusses, Linda does not cite to or argue that there was an entire line of evidence contrary to the ALJ's findings which the ALJ ignored. It is not enough to argue that the ALJ did not discuss certain records where an ALJ is not required to discuss every piece of evidence. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("an ALJ need not mention every piece of evidence, so long he builds a logical bridge from the evidence to his conclusion"). Linda suggests the ALJ impermissibly discredited her testimony due to a lack of medical evidence supporting the severity of her symptoms. What is apparent from the ALJ's discussion of the evidence is that a lack of medical evidence was not the problem; instead, there was an ample amount of longitudinal medical evidence which expressly contradicted the severity of her symptoms (e.g. normal mental findings even when Linda presented as depressed; normal strength in extremities despite Parkinson's disease). This fact accordingly undermines Linda's argument that the ALJ's rejection of the lower GAF scores in this case amounted to the ALJ's decision to ignore or discount evidence favorable to her claim. The ALJ did not ignore or discount the GAF scores out of hand; she listed her reasons for rejecting those scores as insufficiently probative of disability. Additionally, the ALJ simply determined the greater weight of the evidence did not support her claim. The ALJ's RFC assessment in this case is free of harmful legal error and is supported by substantial evidence.

16

On a final note, the Court need not delve into Linda's ostensible argument that the mental RFC which limited her to simple, routine tasks and simple-work-related decisions adequately captured here temperamental deficiencies and limitations in concentration, persistence, or pace.  Her argument is really nothing more than a statement of the ALJ's mental RFC in this case and a citation to Seventh Circuit case law in which the Seventh Circuit addressed the adequacy of the RFC findings in those cases.  As the undersigned has previously explained, the extensive body of case law on this issue makes abundantly clear is that it requires a nuanced application of boilerplate statements of the law to the particular facts of the case.  Linda presents no such application and the Court will not make her arguments for her.  *See Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) ("perfunctory and undeveloped arguments . . . are waived").  In any event, the Court has already determined the ALJ properly weighed Dr. Froman's opinion which, as Linda framed it, pertained to her concentration, persistence, or pace limitations.  Also, the ALJ had the benefit of ME Dr. Carver's testimony that even with her moderate difficulty in concentration, persistence, and pace, Linda's "ability to carry out *simple*, detailed, complex, and even professional instructions and procedures is not impaired."  AR 769 (emphasis added). He also testified that Linda's ability to make judgments and work-related decisions "might be mildly impaired . . . and for simple/routine/repetitive work not a problem[.]"  AR 769. The ALJ gave partial weight to Dr. Carver's opinion as the ALJ gave "more benefit to the claimant in finding her limited as set forth [in the RFC finding]."  AR 748. The weight given Dr. Carver's opinion is reflected in the ALJ's RFC finding which similarly limited Linda to "simple, routine tasks and simple work-related decisions."  AR 743.

## V

For the reasons set forth above, it is recommended that: 1) the Plaintiff's Motion for Summary Judgment (Doc. 13) be denied; 2) the Defendant's Motion for Summary Affirmance (Doc. 17) be granted; 3) The Clerk of Court be directed to enter judgment as follows: "IT IS ORDERED AND ADJUDGED that the decision of the Defendant, Andrew Saul, Commissioner of Social Security, denying benefits to the Plaintiff, Linda W., is AFFIRMED."; and 4) this matter be terminated.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) days after service of this Report and Recommendation. FED. R. CIV. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Failure to object will constitute a waiver of objections on appeal. *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

*It is so recommended.*

Entered on August 5, 2020.

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE

18